UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Carl RICES,<br><br>                            Plaintiff,<br><br>v.<br><br>Nancy A. BERRYHILL, Acting Commissioner of Social Security,<br><br>                            Defendant. | Case No.: 18-cv-0295-GPC-AGS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 13) AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 15)** |

On February 7, 2018, Plaintiff Carl Rices ("Plaintiff") filed this action seeking judicial review of the Commissioner of Social Security's final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. (ECF No. 1.) Plaintiff filed a motion for summary judgment and Defendant filed a cross-motion for summary judgment. (ECF Nos. 13, 15.) After careful consideration of the pleadings, the supporting documents, and the applicable law, the Court **DENIES** Plaintiff's Motion for Summary Judgment, and **GRANTS** Defendant's Cross-Motion for Summary Judgment.[1]

/ / / /

---

[1] While the parties' motions for summary judgment were referred to the Magistrate Judge for report and recommendation, the Court has determined no proposed findings and recommendations by the magistrate judge will be necessary.

1

# I. PROCEDURAL BACKGROUND

Around November 25, 2013, Plaintiff filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act alleging a disability date of January 1, 2010. (Dkt. No. 10, Adminitrative Record ("AR") 19, 213-20.) Plaintiff later amended the alleged onset of disability date to April 20, 2011. (AR 21.) Plaintiff alleged disability because of his bipolar disorder and manic depressive condition. (AR 113.) Plaintiff's claims were initially denied on February 3, 2014, and again upon reconsideration on June 18, 2014. (AR 19, 113-18, 121-26.)

On July 28, 2014, Plaintiff filed a written request for an administrative hearing. (AR 127-28.) On May 26, 2016, Plaintiff appeared with counsel and testified before Administrative Law Judge James S. Carletti. (AR 34-59.) On November 22, 2016, the ALJ issued a written decision finding that Plaintiff was not disabled as defined under the Act. (*Id.*) On December 27, 2017, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. (AR 1-3.)

On February 7, 2018, Plaintiff commenced the instant action seeking judicial review of the Commissioner's decision. (ECF No. 1.) On May 4, 2018, Defendant answered and lodged the administrative record with the Court. (ECF Nos. 9, 10.) On June 22, 2018, Plaintiff moved for summary judgment. (ECF No. 13.) On July 27, 2018, the Commissioner cross-moved for summary judgment and responded in opposition to Plaintiff's motion. (ECF Nos. 15, 16.) Plaintiff did not file an opposition to the Commissioner's Cross-Motion for Summary Judgment.

# II. FACTUAL BACKGROUND

At the time of the hearing before the ALJ, Plaintiff was fifty-two years old. (AR 37.) Plaintiff completed a high school education and had some vocational training in information technology. (*Id.*) Plaintiff claims that he has been disabled since April 20, 2011, due to his bipolar disorder and manic depressive condition. (AR 19, 36.) He testified that he cannot work because he is unable to concentrate as a result of his depression. (AR 40.) Instead, he has been supported financially by his wife and daughter. (AR 39.)

Plaintiff held his last job as a customer service representative at Auto Anything. (AR 38, 242.) There, Plaintiff "would not be able to concentrate" and his supervisor would monitor his calls and he would get "marked down" because he "would have to ask a question over to a customer." (AR 41.) He was fired in April 2011, and has not worked since. (AR 38, 40.) Prior to that position, Plaintiff worked in a tech-support position at Care Fusion. (AR 242.) There, he was let go because his inability to concentrate led to poor call-monitor scores. (AR 42.)

Plaintiff claims that his medication has "helped" and he does not have any negative side effects. (AR 40.) He still experiences the "lack of concentration," but it's "probably a little bit better than when [he] first started off with it." (AR 42-43.) When asked if he could perform a simple job, Plaintiff testified that he would still have problems with concentration because of his inability to focus for an extended period of time and "[j]ust showing up [. . .] on [his] depressed days and doing the job." (AR 54-55.)

**A. Medical Expert Testimony**

Medical expert ("ME") Dr. Nathan R. Strahl testified at the administrative hearing. (AR 46-52.) Although Plaintiff alleges both a bipolar disorder and a manic depressive condition, the ME clarified that a "manic depressive illness is a synonym for bipolar" and the "depression that [Plaintiff] talks about, it's still part of the bipolar disorder." (AR 46.) The ME further noted that Plaintiff's bipolar disorder stems from a "[s]tressful event," where someone he took in "committed a crime and murdered someone." (AR 46-47.) As a result, Plaintiff "overdosed or threatened to overdose" and went to the hospital, where he received a diagnosis of bipolar disorder and was started on Risperdal. (AR 47.)

The ME testified that "the medical record indicates that [Plaintiff is] doing quite well" and that there is "not any real medical documentation even to try to interpret between the lines that he's not doing well on the medication management." (AR 47.) The ME noted that there is no evidence of decompensation except for the single hospitalization. (AR 49.) After Plaintiff left the hospital and started Risperdal, "what they've done basically is continue his medication and it was done very, very well." (AR 48.) Further, the ME opined

that it is his experience that "most people with bipolar disorder when they're stabilized on their medications are quite capable of functioning at the work levels." (AR 51.)

The ME testified that "there is really no consideration that I can find that that bipolar disorder [as] treated is going to have any significant impact on his level of functioning or in this case his ability to work." (AR 48.) The ME found that there have not been consistent periods of time where Plaintiff has been "stressed and moody." (*Id.*) Further, the ME noted that there is no indication in the record that Plaintiff "can't get along with other people." (AR 49.) On cross, Dr. Strahl acknowledged that Plaintiff would not be as successful in completing complex tasks but would be successful in a job involving simple tasks. (AR 50-51.)

**B. Vocational Expert Testimony**

Vocational expert ("VE") Bonnie Sinclair testified that Plaintiff's past work as a customer service representative is "skilled" and "sedentary." (AR 56.) During the hearing, the ALJ asked the VE a hypothetical question involving assumptions of a similar-aged individual with the same level of education, work history, and limitations as Plaintiff. (AR 57.) The ALJ asked whether such individual would be able to perform the prior work activity and whether any other work activity existed that could be performed. (*Id.*) The VE responded that the individual would not be able to perform the prior work activity but that there were other work options available. (*Id.*) The first option included working as an industrial cleaner, to which there are 1.13 million national positions. (*Id.*) The second option included working as a packer, with 174,600 national positions available. (*Id.*) The ALJ asked the VE how many day a month an individual could miss work and keep these positions, to which the VE responded, "No more than one." (AR 57-58.) When asked by Plaintiff's counsel whether an individual who was "off task in their job 15 percent or more of the day" would be able to sustain the job, the VE responded "No." (AR 58.)

**C. Medical Evidence**

On March 7, 2011, Plaintiff arrived at Sharp Grossmont Hospital's emergency room with complaints of depression and suicidal ideations and was admitted to the Sharp

4

Grossmont Behavioral Health department. (AR 326-27, 333.) Plaintiff reported that he was considering overdosing on his medications because he had been "more depressed this last week" and "under more stress." (AR 326.) Plaintiff also reported that he "had increasing problems with difficulty concentrating and depression going back several years." (AR 339.) Approximately five or six years earlier, Plaintiff's nephew was released from prison, moved into Plaintiff's house for a few months, and then moved out. (*Id*.) Shortly after moving out, he was arrested for murdering two people that Plaintiff knew. (*Id*.) Plaintiff was "eventually put on the stand" and his nephew is now on death row. (*Id*.) Plaintiff also reported that he lost a well-paying job and was having problems with his marriage. (*Id*.)

On admission, Dr. John L. Otis assessed Plaintiff a Global Assessment of Functioning[2] rating of 58. (AR 341.) Dr. Otis reported that Plaintiff was oriented to person, place, and time, and that his recent and remote memory were generally intact. (AR 341.) Dr. Otis also reported that Plaintiff admitted to being "overwhelmed and suicidal" the night before, but that he now "denie[s] any suicidal ideation." (*Id*.) Plaintiff also denied any hallucinations or signs of psychosis. (*Id*.)

On March 9, 2011, Plaintiff was released for outpatient follow-up and provided with a list of psychiatrists available through his insurance. (AR 334.) Dr. Otis noted that Plaintiff had been taking the antidepressant Wellbutrin as prescribed by his family physician and

---

[2] The GAF is a 100-point mental-health scale for rating a patient's social, occupational, and psychological functioning, with 100 being the most high functioning and 1 the least. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (citation omitted). Three GAF ranges relevant here are:
- 61-70: "Some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
- 51-60: "Moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or coworkers)."
- 41-50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

*Id*. (citation omitted).

stressed to Plaintiff the "importance of going and seeing a psychiatrist on an outpatient basis." (*Id.*) Plaintiff was assessed a GAF rating of 65 on discharge. (AR 335.) After the initial treatment in March 2011, the record lacks mental-health treatment records until June 20, 2013.

On June 20, 2013, Plaintiff saw Dr. Judith S. Salleh. (AR 413-15.) Plaintiff had seen Dr. Muhammad Azam in the past, but had not gone to see him in almost two years. (AR 413.) Dr. Salleh reported that Plaintiff had lost his health insurance and ran out of his medications four months prior. (*Id.*) He was now "feeling anxious at times then withdrawn." (*Id.*) Dr. Salleh referred Plaintiff to the psych department for an evaluation. (AR 415.)

On July 6, 2013, Plaintiff saw Dr. Kevin M. Kelly and complained about tooth pain. (AR 311, 313.) Dr. Kelly recognized Plaintiff's bipolar disorder, but reported that Plaintiff had "[n]ormal mental status" and wrote "within the normal range" under the heading "Psychiatric." (AR 313-14.) Dr. Kelly also reported that Plaintiff "denies any depression, anxiety, or hallucinations." (AR 313.)

On July 16, 2013, licensed clinical social worker Laurie Lehman assessed Plaintiff a GAF rating of 50 after a ninety-minute intake interview. (AR 397.) Plaintiff's attitude was "[c]ooperative calm friendly," his memory and recall were "good," he denied any suicidal ideation, and his mood was "[e]uthymic." (*Id.*) Lehman reported that Plaintiff had restarted his medications after stopping because of a lack of insurance. (AR 391.) Lehman also reported Plaintiff still experienced "a depressed mood several days a week" after restarting his medication. (*Id.*)

On July 24, 2013, Plaintiff saw Dr. Azam for the first time since November 17, 2011. (AR 529.) Plaintiff complained of urinary issues, nausea, and vomiting, but did not mention depression. (*Id.*)

On August 26, 2013, Plaintiff saw Dr. Joshua Tartaglione at the Psychiatric Emergency Clinic for a medication adjustment. (AR 385-88.) Dr. Tartaglione reported that Plaintiff was not sure if his medication was making a difference because his anxiety had

6

worsened the prior two weeks and he was having emotional episodes that resulted in crying. (AR 385.) Dr. Tartaglione described Plaintiff's behavior as "cooperative" and "pleasant" with "only one teary eyed episode." (AR 386.) He noted that Plaintiff described his mood as "[d]oing alright I guess." (*Id.*) Plaintiff was "calm and collected while sitting, anxious once he gets talking, [and] sincere in seeking help." (*Id.*)

On October 7, 2013, Plaintiff saw Dr. Jonathon Howlett for the first time. (AR 379-80.) In his intake note, Dr. Howlett reported that Plaintiff first received psychiatric treatment after his March 7, 2011 hospitalization. (AR 380.) Dr. Howlett also reported that Plaintiff had "other depressive episodes lasting up to 3 months," but that "he has been less depressed since starting on medication about 3 months ago." (*Id.*) Dr. Howlett further reported that Plaintiff "states he is currently not depressed, although he feels down at times." (*Id.*) During his mental status exam, Plaintiff's attitude was "[v]ery pleasant and cooperative," his mood was "anxious," and he denied having suicidal ideations. (AR 381.) Specifically, Dr. Howlett reported that Plaintiff's mood was "relatively stable" on his medication, but that Plaintiff described having "very significant anxiety which is related to financial stress." (*Id.*) Dr. Howlett assessed Plaintiff a GAF rating of 48. (*Id.*)

On October 11, 2013, Plaintiff saw Dr. Azam and complained of nausea and vomiting. (AR 528.) Dr. Azam noted that Plaintiff had a history of depression, but that it was "well-controlled on medication." (*Id.*) Dr. Azam further reported that Plaintiff's mood and affect were "appropriate." (*Id.*)

On November 4, 2013, Plaintiff saw Dr. Howlett for a follow-up appointment. (AR 378.) In his follow-up note, Dr. Howlett noted that Plaintiff was "[v]ery pleasant and cooperative." (*Id.*) Dr. Howlett reported that Plaintiff's mood was "depressed," but he was "able to smile and joke at times." (AR 379.) Dr. Howlett also reported that Plaintiff denied having suicidal ideations and there was no evidence of psychosis. (*Id.*) Dr. Howlett assessed Plaintiff a GAF rating of 48. (*Id.*)

On January 6, 2014, Dr. Howlett completed a residual functional capacity questionnaire and assessed Plaintiff a GAF rating of 48. (AR 423.) In the section of the

questionnaire discussing Plaintiff's ability to complete work-related activities, Dr. Howlett marked that Plaintiff was "unable to meet competitive standards"[3] in three categories: (1) "Complete a normal workday and workweek without interruptions from psychologically based symptoms;" (2) "Deal with normal work stress;" and (3) "Deal with stress of semiskilled and skilled work." (AR 425-26.) Specifically, Dr. Howlett reported that "work stress could lead to decompensation in terms of mood and irritability which may lead [Plaintiff] to be unable to meet work expectations." (AR 425.) Dr. Howlett also marked that Plaintiff had "[t]hree or more episodes of decompensation within 12 months, each at least two weeks long." (AR 427.) Dr. Howlett further marked that Plaintiff had none or mild "[r]estriction of activities of daily living," moderate "[d]ifficulties in maintaining social functioning," and marked "[d]ifficulties in maintaining concentration, persistence or pace." (*Id*.)

On April 14, 2014, Dr. Howlett met with Plaintiff for a follow-up appointment. (AR 439.) Dr. Howlett reported that Plaintiff "has noted significant improvement since starting risperidone. He noted improvement in irritability, excessive energy […], and distractibility." (AR 439-40.) Dr. Howlett also reported that Plaintiff "denies depressed mood," but continues "to have elevated energy and some irritability." (AR 440.) Dr. Howlett noted that Plaintiff's attitude was "pleasant and cooperative," his mood was "better," and his affect was "less dysphoric than previous visit." (*Id*.) Dr. Howlett assessed Plaintiff a GAF rating of 55. (AR 441.)

On April 21, 2014, Plaintiff attended a mood/sleep orientation group. (AR 438.) Licensed clinical social worker Jill S. Gordy-Moody marked that Plaintiff's mood was within the normal range and that there was no evidence of suicidal ideation. (AR 439.)

---

[3] For purposes of the questionnaire, "[u]nable to meet competitive standards means your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (AR 425.)

On June 23, 2014, Plaintiff saw Dr. Azam for a physical exam. (AR 525.) Dr. Azam noted that Plaintiff was alert, oriented, and had no new complaints. (*Id.*) Dr. Azam did not mention depression. (*See id.*)

On August 11, 2014, Plaintiff saw Dr. Mary Katherine C. McGovern and Dr. Richard L. Hauger. (AR 627-30.) Dr. McGovern noted that Plaintiff reported "he is doing well" and denied "any mood liability despite recent stressors including homelessness and having his bike stolen." (*Id.*) Plaintiff reported that "he is getting along well with his wife and child" and denied any suicidal ideation." (*Id.*) Dr. McGovern reported that Plaintiff's attitude was "pleasant and cooperative" and his mood was "great." (AR 628.) Dr. McGovern also reported that Plaintiff "feels his symptoms are well-controlled." (*Id.*)

On September 29, 2014, Plaintiff saw Dr. McGovern and Dr. Hauger. (AR 619-21.) Dr. McGovern noted that Plaintiff reported "he is doing well." (AR 620.) Dr. McGovern reported that Plaintiff's attitude was "pleasant and cooperative" and his mood was "stable." (*Id.*) Dr. Hauger reported that Plaintiff was continuing to do "very well psychiatrically." (AR 622.) Dr. Hauger also reported that Plaintiff "feels 'stable' without any depression, mood cycling, irritability, or hypomania." (*Id.*)

On June 8, 2015, Plaintiff saw Dr. McGovern and Dr. Hauger. (AR 606-08.) Dr. McGovern reported that Plaintiff stated "he feels that his mood is good, but notes that his wife has noticed some 'slow' periods, when his cognition seems slowed." (AR 606.) Dr. McGovern further reported that Plaintiff's attitude was "pleasant and cooperative" and his mood was "good." (AR 607.) Plaintiff's affect was "constricted," but he smiled appropriately. (*Id.*)

On September 28, 2015, Plaintiff saw Dr. Amanda C. Ries and Dr. Hauger. Dr. Ries noted that Plaintiff reported "he is doing well" and he feels "good." (AR 601, 603.) Dr. Ries also noted that Plaintiff's "mood swings have been much less intense and less frequent since being on this combination" of medications. (AR 602.) Dr. Ries further noted that Plaintiff claimed "his episodes of 'depression' now are barely noticeable relative to previous years when not on these meds." (*Id.*)

On January 7, 2016, Plaintiff saw Dr. Azam and complained of pain his right foot. (AR 517-19.) Dr. Azam noted that Plaintiff appeared "well developed, well nourished, [and] in no acute distress." (AR 518.) Dr. Azam also reported that Plaintiff was "oriented to person, place, and time" and that his mood and affect were appropriate. (AR 519.)

On February 1, 2016, Plaintiff saw Dr. Ries and Dr. Hauger. (AR 589-95.) Dr. Ries reported that Plaintiff appeared "well developed," "well nourished," and had appropriate grooming and hygiene. (AR 590.) Plaintiff's behavior was "calm" and "cooperative," and he described his mood as "I feel good." (*Id.*) Dr. Ries also reported that Plaintiff's insight and judgment were "good" and that he was "awake, alert and attentive." (*Id.*) Dr. Ries noted that Plaintiff "denies any mood liability and feels his symptoms are well-controlled." (*Id.*)

On February 7, 2016, Plaintiff saw Dr. Prakash Bhatia. (AR 585.) Dr. Bhatia noted that Plaintiff had a history of bipolar disorder, but that he was "currently stable" on his medications. (*Id.*) Dr. Bhatia also noted that Plaintiff's mood was stable and that he denied any suicidal ideation. (*Id.*) Dr. Bhatia reported that Plaintiff's grooming was "dirty," but his behavior was "cooperative." (*Id.*) Plaintiff's mood was "unremarkable (euthymic)" and his affect was "flat/blunted." (*Id.*) Dr. Bhatia also reported that Plaintiff's thought process and insight were normal, but that his immediate recall was impaired. (*Id.*) He was "alert" and oriented to person, place, and time, but had an "impaired ability to manage daily activities." (*Id.*) Dr. Bhatia assessed Plaintiff a GAF rating of 65 and noted that he was "depressed, moderate" with a "fair" prognosis. (AR 586.)

On March 16, 2016, Plaintiff saw Dr. Bhatia. (AR 582.) Dr. Bhatia reported that Plaintiff's mood was "unremarkable (euthymic)" and his affect was "flat/blunted" with no suicidal ideation." (*Id.*) Dr. Bhatia assessed Plaintiff a GAF rating of 65. (AR 583.)

**D. ALJ's Decision**

For purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

10

18-cv-0295-GPC-AGS

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant meets the definition of disabled, the ALJ employs a five-step sequential evaluation. 20 C.F.R. § 416.920(a); *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). If the ALJ determines that a claimant is either disabled or not disabled at a step in the process, the ALJ does not continue on to the next step. *See* 20 C.F.R. § 416.920(a)(4); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). In short, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a). Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC. *See* 20 C.F.R. § 416.920(e); *Bray*, 554 F.3d at 1222-23. The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five. *Bray*, 554 F.3d at 1222.

Here, the ALJ applied the five-step sequential evaluation and determined that Plaintiff is not disabled. (AR 19-27.) First, the ALJ determined that Plaintiff met the insured statute requirements of the Act through December 31, 2016. (AR 21.) Then, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 20, 2011, the amended alleged onset date. (*Id.*) At step two, the ALJ found that Plaintiff has a severe impairment of bipolar disorder. (*Id.*) At step three, the ALJ found that Plaintiff does not have an "impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1." (AR 22.) At step four, the ALJ determined that Plaintiff has the RFC[4] to perform a full range of work at all exertional levels but with the following nonexertional limitation: Plaintiff can remember and carry out simple and routine and even detailed tasks but not complex tasks. (*Id.*) Pertinently, in making this determination, the ALJ discounted the relevance of Plaintiff's treating physician Dr. Jonathon Howlett because his opinions were "inconsistent with" and "not supported" by the record.

Given Plaintiff's RFC, the ALJ concluded that Plaintiff is unable to perform past relevant work. (AR 25.) However, relying on the vocational expert's testimony, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (AR 26.) Therefore, the ALJ concluded that Plaintiff has not been under a disability as defined by the Act, since April 20, 2011, through the date of the decision of November 22, 2016. (AR 26-27.)

**III. LEGAL STANDARD**

A district court has jurisdiction to review final decisions of the Commissioner of Social Security. 42 U.S.C. § 405(g). Section 405(g) permits the court to enter a judgment affirming, modifying, or reversing the Commissioner's final decision. *Id*. The matter may also be remanded to the Commissioner for further proceedings. *Id*. The scope of judicial review is limited, and the Commissioner's final decision should not be disturbed unless it is "not supported by substantial evidence or it is based on legal error." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotations and citations omitted); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (court "will disturb the denial of benefits only if the decision contains legal error or is not supported by substantial evidence").

---

[4] Residual functional capacity is defined as "the most you can still do despite your limitations." *See* 20 C.F.R. § 404.1545(a)(1). "Ordinarily, RFC is the individual's maximum rendering ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, . . . mean[ing] 8 hours per day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (internal quotations and citations omitted). The evidence must be "more than a mere scintilla," but may be less than a preponderance. *Id*. Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Tommasetti*, 533 F.3d at 1038. Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that "the ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).

## IV. DISCUSSION

Plaintiff argues that the final decision by the Commissioner is erroneous because the ALJ failed to provide specific and legitimate reasons for rejecting treating physician Dr. Howlett's opinion. (ECF No. 13-1, at 7-9.) Defendant opposes.

Generally, the ALJ should provide greater weight to the opinions of a treating physician. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) ("The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record.'" (quoting 20 C.F.R. § 404.1527(c)(2))); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) ("Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians."). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Trevizo, 871 F.3d at 675 (quoting Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)). Here the

13

ALJ provided specific and legitimate reasons supported by substantial evidence to discount the opinions of Dr. Howlett.

First, the ALJ reasoned that Dr. Howlett's opinion is "inconsistent with the objective findings in mental status examinations of record, including his own, which have been mostly unremarkable, other than depressed mood." (AR 24.) Contrary to Plaintiff's argument, the record supports the ALJ's argument that the mental status examinations were "mostly unremarkable." Of the thirteen mental status examinations in the record, ten indicate that Plaintiff had an unremarkable, stable, or even positive mood. (*See* AR 386, 397, 440, 582, 585, 590, 603, 607, 620, 628.) Only three of Dr. Howlett's mental status examinations suggest otherwise, with one reporting that Plaintiff's mood was "up and down," another reporting that Plaintiff's mood was "anxious," and the last reporting that Plaintiff's mood was "depressed," but that Plaintiff was also "able to smile and joke at times." (AR 443, 381, 379.) Accordingly, the ALJ's conclusion is supported by substantial evidence in the record and is a reasonable reading of the record. *See Tommasetti*, 533 F.3d at 1038 (holding the court must uphold the ALJ's findings so long as they are supported by inferences drawn reasonably from the record).

Second, the ALJ remarked that there is "no objective evidence of significant cognitive defects that support the claimant's allegations of poor concentration and memory." (AR 24.) Again, the record supports the ALJ's conclusion that Plaintiff had "intact recent and remote memory as well as an absence of any significant cognitive defects." (*Id.*) Of the thirteen mental status examinations, only two reference impaired memory. (*See* AR 582-83, 585.) Specifically, those mental status examinations reported "impaired immediate recall," but that Plaintiff was alert and oriented to person, place, and time, and had normal thought process, insights, and sensory perception. (*Id.*) Even when Plaintiff was admitted to the hospital with suicidal ideations–arguably his lowest point–Dr. Otis reported that Plaintiff's "[r]ecent and remote memory were generally intact," even though Plaintiff admitted to "having some trouble concentrating." (AR 334.) One mental status examination specifically noted that Plaintiff's memory and recall were "good," and

14

that Plaintiff's thinking process was "linear and logical" with "no evidence of flight of ideas." (AR 397.) Moreover, Dr. Howlett's own mental status examinations made no mention of impaired memory or cognitive defects. (*See* AR 378-79, 381, 443.) Instead, Dr. Howlett reported that Plaintiff's thought process was "linear" and his insight and judgment was "fair/good." (*Id.*) Finally, the remaining mental status examinations made no mention of impaired memory or cognitive defects, but indicated that Plaintiff had a logical and organized thought process, fair or good insight and judgment, and that Plaintiff was alert and oriented to person, place, and time. (*See* AR 386-87, 440, 590, 603, 607, 620, 628.) Thus, the ALJ's reason for rejecting Dr. Howlett's opinion is supported by substantial evidence in the record and a reasonable reading of the record. *See Tommasetti*, 533 F.3d at 1038.

Third, the ALJ noted that Dr. Howlett's records and other treating records show that Plaintiff's symptoms are stable when Plaintiff is compliant with his prescribed treatment. (AR 24.) The record supports the ALJ's conclusion that Plaintiff's "medications have been relatively effective in controlling [his] symptoms." (AR 23.) When Plaintiff saw Dr. Howlett for the first time, Dr. Howlett reported that Plaintiff had been less depressed since restarting his medication. (AR 380.) Specifically, Dr. Howlett reported that Plaintiff's mood was "relatively stable" on his medication. (AR 381.) During a follow-up appointment, Dr. Howlett reported that Plaintiff "noted significant improvement since starting risperidone." (AR 439.) In addition, Dr. Howlett reported that Plaintiff's mood was "better" and that Plaintiff "denies depressed mood." (AR 440.) Moreover, Dr. Azam reported that Plaintiff's depression was "well-controlled on medication," Dr. McGovern reported that Plaintiff felt "his symptoms are well-controlled," and Dr. Ries reported that Plaintiff claimed "his episodes of 'depression' now are barely noticeable relative to previous years when not on these meds." (AR 528, 628, 602.) Finally, Dr. Bhatia reported that Plaintiff was "currently stable" on his medications. (AR 585.) Therefore, the ALJ's reason is supported by substantial evidence in the record and a reasonable reading of the record. *See Tommasetti*, 533 F.3d at 1038.

15

Fourth, the ALJ explained that Dr. Howlett's opinion was inconsistent with his assigned GAF ratings of 48 and 50 (in the past year) in 2013/2014. (AR 24, 377, 381, 443.)

A GAF score between 41-50 reflects "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See Keyes-Zachary, 695 F.3d at 1162 n.1.

On October 7, 2013, during Plaintiff's first visit with Dr. Howlett, Plaintiff reported he was "less depressed" since starting medication three months ago. (AR 380.) He stated he was not currently depressed but feels down at times but denied suicidal ideation. (Id.) He reported that he has periods of irritability, distractibility, and racing thoughts. (Id.) Dr. Howett noted that he was well groomed and dressed and very pleasant and cooperative. (Id.) He was somewhat fidgety in the chair with an "anxious" mood and affect but his thought process was linear. (AR 381.) Dr. Howlett assessed a GAF of 48. (Id.) In a follow up appointment on November 4, 2013, Plaintiff states that with the adjustment in his medication, his anxiety has decreased but he is feeling more depressed over the past 1-2 weeks with lower energy and motivation. (AR 378.) He denied suicidal ideation. (Id.) Dr. Howlett noted that he has "ongoing moderate mood instability." (AR 379.) He assessed Plaintiff with a GAF of 48. (Id.)

On January 10, 2014, Dr. Howlett rated Plaintiff with a GAF of 48. (AR 443.) Plaintiff reported that his hypomanic symptoms of increased energy, distractibility and irritability have increased. (AR 442.) He also had some depression symptoms of crying spells, low motivation and periods of hopelessness. (Id.) He denied any suicidal ideation. (AR 443.) Dr. Howlett opined that Plaintiff "seems to have ongoing moderate mood instability which seems slightly worse now than prior visits." (Id.)

On May 14, 2014, Dr. Howlett assessed Plaintiff with a GAF of 55. (AR 441.) Plaintiff noted improvement in hypomanic symptoms due to the medication but continues to have some irritability and distractibility. (AR 440.) Dr. Howlett noted he was well groomed and dressed and less fidgety than prior visits. (Id.) Plaintiff was pleasant and

cooperative with normal speech and "better" mood. (Id.) His thought process was linear and he had fair/good judgment. (Id.)

Because a GAF score of 48/50 requires "serious" symptoms, including suicidal ideation, which are not reflected in Dr. Howlett's opinions, the ALJ's assessment that Dr. Howlett's opinion of Plaintiff's mental condition is inconsistent with his assesed GAF score of 48/50 is supported by substantial evidence.

Fifth, the ALJ explained that Dr. Howlett's opinion was inconsistent with the GAF ratings assigned to Plaintiff by other treating physicians. (AR 24-25.) Dr. Howlett's opinion included a GAF rating of 48 on January 6, 2014. (AR 423.) However, just three months later, Dr. Howlett himself assessed Plaintiff a GAF rating of 55 on April 14, 2014. (AR 440-41.) Even at his worst point when Plaintiff was originally admitted to the hospital after feeling suicidal, in March 2011, Dr. Otis assessed a GAF rating of 58. (AR 341.) Plaintiff was then assessed a GAF rating of 65 upon discharge from the hospital two days later.[5] (AR 335.) Then a couple of years later, noting that Plaintiff was "depressed, moderate," Dr. Bhatia assessed Plaintiff a GAF rating of 65 on February 17, 2016. (AR 586.) Plaintiff argues that Dr, Bhatia's GAF score of 65 in 2016 has no relevance to Dr. Howlett's opinion in January 2014. The Court agrees that the ALJ's reference to Dr. Bhatia's GAF score in 2016 does not demonstrate inconsistency with Dr. Howlett's GAF assessment in 2013/2014. However, the ALJ also noted that Dr. Howlett's GAF score was inconsistent with the GAF Plaintiff received at his worst mental state when he was hospitalized in March 2011 with a GAF score of 58 when admitted and a score of 65 when he was

---

[5] The only other GAF rating Plaintiff received was a rating of 50 by a licensed clinical social worker on July 22, 2013. (AR 397.) At that time, he had recently restarted his medication for about a month after stopping in December 2012 due to lack of insurance for six months. (AR 391.) But in another report, it states that Plaintiff resumed medication management in July 2013 and had stopped medications since August 2012 due to loss of insurance. (AR 411.) "While under medication management with a psychiatrist, his symptoms were less than they are now, 'I'm not anywhere where I was before though.'" (Id.) Though the dates of when Plaintiff stopped his medication and when he re-started are not consistent, it is not disputed that when Plaintiff stopped his medication, his mental condition worsened.

17

discharged two days later. Accordingly, the ALJ's reason is supported by substantial evidence supported by the record and is a reasonable reading of the record for the ALJ to conclude that Dr. Howlett's GAF rating of 48 was inconsistent with the GAF ratings assessed by other physicians. *See Tommasetti*, 533 F.3d at 1038.

Finally, the ALJ faulted Dr. Howlett's statement that Plaintiff "had three documented instances of decompensation," where the record shows Plaintiff "only had a brief, 3-day psychiatric hospitalization for depression with suicidal ideation." (AR 25.) An "episode of decompensation" is defined in the questionnaire Dr. Howlett filled out as a temporary increase or exacerbation of symptoms lasting two or more weeks. (AR 427.) But, so defined, the record has no "episodes of decompensation." Even assuming Plaintiff's brief hospitalization was a temporary exacerbation of symptoms, it did not have the duration necessary to qualify as an episode of decompensation. Moreover, there is no evidence of any other instances of decompensation in the record. Accordingly, this was a specific and legitimate reason to give Dr. Howlett's opinion less weight.

Accordingly, on the present record, the ALJ provided specific and legitimate reasons supported by substantial evidence to discount the testimony of Dr. Howlett.

## V. CONCLUSION

Based on the foregoing review of the relevant law and the administrative record, the Court finds that the Administrative Law Judge applied the correct legal standards when he denied Plaintiff's claim and that his conclusions are supported by substantial evidence. For the foregoing reasons, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment. The Clerk of Court shall enter judgment accordingly.

IT IS SO ORDERED.

Dated: February 4, 2019

Hon. Gonzalo P. Curiel
United States District Judge